**IT IS ORDERED as set forth below:**

**Date: September 2, 2021**

_____

**Jeffery W. Cavender**
**U.S. Bankruptcy Court Judge**

_____

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| IN RE: | CASE NO. 19-66374-JWC |
| JAREIQ AHMAD JOSEF KABARA, | CHAPTER 7 |
| Debtor. | |
| CINQ MUSIC GROUP, LLC, | |
|      Plaintiff, | |
| v. | ADVERSARY PROCEEDING |
| JAREIQ AHMAD JOSEF KABARA and FTR ENTERTAINMENT, LLC, | NO. 20-06009-JWC |
|      Defendants. | |

## MEMORANDUM OPINION AND ORDER

In 2018, Cinq Music Group, LLC and Jareiq Ahmad Josef Kabara entered an arrangement in which Cinq agreed to provide funding to FTR Entertainment, LLC, a new entity of which Kabara

would be manager, to produce music recordings from four different artists.  Upon completion and

delivery, Cinq would have distribution rights to the recordings. Although the parties attempted to

negotiate further terms, Cinq ultimately declined to continue funding FTR. After Cinq

discontinued funding, Kabara funded FTR personally for a while, but he eventually terminated

FTR in July 2019 without delivery of the recordings.

Cinq filed an  action in California against Kabara and FTR ("Defendants") on August 30,

2019, and Kabara filed the above-captioned bankruptcy case as an individual on October 11, 2019,

under Chapter 7 of the Bankruptcy Code.[1]  Cinq initiated this adversary proceeding seeking to

pierce the corporate veil to hold Kabara personally liable for FTR's debt to Cinq, to except that

debt from Kabara's discharge under 11 U.S.C. § 523(a), and to obtain a judgment against

Defendants for the entirety of the debt owed to Cinq, including amounts loaned and lost revenue.

Kabara filed a Motion for Summary Judgment (Doc. No. 65) seeking dismissal of the adversary

proceeding in its entirety, to which Cinq responded (Doc No. 72) (the "Response").   For the

reasons set forth below, the Motion will be GRANTED in part and DENIED in part.

I.      SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a) and Fed. R. Bankr. P. 7056; *see also Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913,

918-19 (11th Cir. 1993).  A fact is material if it might affect the outcome of a proceeding under the

governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (U.S. 1986).  A

---

[1] Unless otherwise indicated, all statutory references contained herein will be to the Bankruptcy Code, 11 U.S.C. §
101 *et seq.*; all references to a Federal Rule are to the Federal Rules of Civil Procedure; and all references to a
Bankruptcy Rule are to the Federal Rules of Bankruptcy Procedure.

dispute of fact is genuine "if the evidence is such that a reasonable jury [or finder of fact] could return a verdict for the nonmoving party." *Id*.

At the summary judgment stage of a proceeding, the Court's function is not to determine the truth of the matter by weighing the evidence, but rather to determine if there is a genuine issue for trial. *Id*. When making this determination, the Court must view the evidence in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Rosen v. Biscayne Yacht & Country Club, Inc.*, 766 F.2d 482, 484 (11th Cir. 1985). "All reasonable doubts and inferences should be resolved in favor of the opponent." *Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1502 (11th Cir. 1985).

The moving party bears the burden of establishing the right to summary judgment. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Clark v. Union Mut. Life Ins. Co.*, 692 F.2d 1370, 1372 (11th Cir. 1982). The moving party must identify those evidentiary materials listed in Federal Rule 56(c) that establish the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986); *see also* Fed. R. Civ. P. 56(e). Where the moving party does not bear the burden of proof at trial,

> the movant may satisfy its burden in one of two ways. First, it can put forward "affirmative evidence demonstrating that the [non-movant] will be unable to prove its case at trial." Second, it can "point[ ] out to the district court that there is an absence of evidence to support the [non-movant's] case."

*Chambers v. Real Time Resols., Inc.*, No. 1:17-CV-5256-TWT, 2018 WL 5113056, at *2 (N.D. Ga. Oct. 19, 2018) (citing *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993)).

Once the moving party makes a *prima facie* showing that it is entitled to judgment as a matter of law, the nonmoving party must go beyond the pleadings and demonstrate that there is a material issue of fact that precludes summary judgment. *Celotex*, 477 U.S. at 324; *Martin v.*

*Commercial Union Ins. Co.*, 935 F.2d 235, 238 (11th Cir. 1991).  "[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (citations omitted).  If the moving party presented affirmative evidence, then the nonmoving party "must respond with 'evidence sufficient to withstand a directed verdict at trial on the material fact sought to be negated.'" *Chambers*, 2018 WL 5113056, at *2. If the moving party instead pointed to an absence of evidence, then the non-moving "party must either identify evidence 'ignored or overlooked' by the movant or must come forward with evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'" *Id.*

## II.    FINDINGS OF FACT

As discussed below, several material facts are disputed or unclear in the record before the Court. The Court, however, finds the following material facts to be undisputed for purposes of the Motion except where specifically indicated otherwise:

At some point prior to FTR's formation, Cinq and Kabara agreed to work together to produce recordings from four different artists, though the parties dispute who initiated the relationship.  At some point thereafter it was decided that FTR, a new entity to be owned by Kabara, would produce the recordings, and Cinq would provide funding to FTR for the production. FTR was formed as a limited liability company in the State of Georgia on May 11, 2018, with the assistance of GoDigital Media Group, LLC ("GoDigital"), Cinq's parent company.  (Doc. No. 65 [Def., Ex A.])  At the time of formation, Kabara was the only member of FTR, and Kabara executed an Operating Agreement for the LLC.  On May 22, 2018, Kabara, on behalf of FTR,[2] also executed a Note to Cinq to memorialize the loan agreement to produce the records.  (Doc. No. 72 [Peterson

---

[2] Nothing in the record suggests Kabara guaranteed or otherwise agreed to be personally liable for the debt of FTR.

Decl., Ex. 1.])  The Note allowed Cinq to convert all or part of its debt to a controlling equity interest in FTR, but it gave Cinq no equity in FTR prior to exercising the conversion right.  [*Id.*] On June 4, 2018, Kamal Moo was granted 50,000 Class C shares of FTR.  [Def., Ex. D.]  On August 28, 2018, and February 5, 2019, FTR's annual registration was renewed with Moo listed as manager of FTR.

The specifics are murky, but it appears undisputed that in June of 2018 Cinq and FTR came to some form of agreement or approval of a 5-month budget totaling $335,750.  [Peterson Decl., Ex. 2.] The budget included specific line items for expenditures, but it is not clear from the record whether the budget was binding, whether it was subject to change, or whether it was even required by any document.  In short, while a budget certainly existed, how the budget governed the parties' dealings is unclear.

For the months of June through September, Kabara requested funding via email or writing, which Cinq would review and approve.  Though the exact dates are not certain, Cinq advanced approximately $335,000 between June and September 2018.  [Peterson Decl.]  In September 2018, Kabara provided financial information to Cinq and requested additional funding in October of 2018.  Instead of advancing additional funds, on October 8, 2018, Jason Peterson, Manager of Cinq and GoDigital, sent an email to FTR, including Kabara and Moo, informing of Cinq's decision to convert its debt to a 51% equity ownership of FTR.  The email also dictated the terms Cinq required to continue funding FTR.  Although the specific date on which Cinq provided its final advance to FTR is unclear from the record, Cinq advanced no funds after the October 8 email from Jason Peterson.  Cinq also had no equity interest in FTR prior to the October 8 email, though, as discussed below, Kabara disputes whether Cinq's attempt to convert its debt to equity by the October 8 email was valid.

Although the specific circumstances after October 2018 are disputed, the parties agree they then attempted to negotiate future funding terms for the project, but the negotiations failed.  Kabara personally paid more than $80,000 of FTR's expenses from October 2018 to July 2019.  Kabara did not hold annual meetings for FTR, and no board of managers was selected as set out in FTR's Operating Agreement during the company's existence from May 2018 to when Kabara terminated it in July 2019.  (Doc. No. 72 [Cinq Resp., Ex. B.])

The undisputed facts end there.  The following material factual issues are either unclear or disputed.  First, as noted above, how the budget governed the parties' dealings remains unclear.  The only thing certain from the record is that a budget existed.  Likewise, it is disputed whether Kabara admitted to Peterson that Kabara knew the budget was falsely deflated and would not be sufficient to produce the agreed upon recordings and whether Kabara continued with that budget to induce Cinq into investing additional capital to protect its initial investment.  This fact from Peterson's Declaration is material to Cinq's claims, but Cinq presents it as disputed in their response to Kabara's Statement of Material Facts.  [Cinq Resp., p. 151.]  Further, Kabara's Declaration states that he had no intent to injure or mislead Cinq and that Cinq simply made a bad business judgment.

Next, the parties dispute whether the Note was signed by Cinq.  Kabara asserts the Note was never signed by Cinq, making Cinq's attempt to convert its debt to equity invalid.  (Doc. No. 47 [Compl., Ex. B.])  Cinq, however, presented evidence that Cinq signed the Note, [Peterson Decl., Ex. 1], but also argues that the facts of the case would support the validity of the Note even assuming Cinq had not signed it.

Additionally, whether Kabara followed certain corporate formalities and terms of the FTR Operating Agreement is disputed.  Cinq argues Kabara failed to abide by the Operating Agreement

in failing to appoint a board of managers. In contrast, Kabara presented evidence that he had been in the process of selecting a board but did not have time to do so since the company operated for less than a year. [Def., Ex. E.] As the foregoing discussion suggests, the Court finds that numerous material facts remain in dispute for trial, though only for some of Cinq's claims. The Court now turns to each claim and analyzes whether the disputed and undisputed facts support Kabara's request for summary judgment.

III.   LEGAL ANALYSIS

a.   Count IV - Piercing the Corporate Veil

Kabara first requests summary judgment on Count IV—piercing the corporate veil of FTR. Kabara asserts that the facts of this case do not support piercing the corporate veil, and that Kabara should not be held personally responsible for FTR's liabilities. Cinq counters that it presented enough evidence to take the issue to trial and that this inquiry is inherently an issue for the finder of fact.

The concept that corporations are legally distinct from their shareholders, directors, officers, and employees is no less true when the corporation is wholly owned by a single individual. *Ralls Corp. v. Huerfano River Wind, LLC*, 27 F. Supp. 3d 1303, 1328–29 (N.D. Ga. 2014). Incorporation shields members from personal liability unless some legal reason exists to pierce the corporate veil, an action that courts should take with great caution. *Id.* To disregard the corporate form in Georgia, "it is necessary to show that the shareholders disregarded the corporate entity and made it a mere instrumentality for the transaction of their own affairs; that there is such unity of interest and ownership that the separate personalities of the corporation and the owners no longer exist." *Baillie Lumber Co. v. Thompson*, 279 Ga. 288, 289–90 (2005). The purpose of this theory is to remedy injustices which arise because a party has over-extended his privilege in the use of a

corporate entity to defeat justice, to perpetuate fraud, or to evade contractual or tort responsibility. *Id*. at 290.  The plaintiff must prove "that the defendant disregarded the separateness of legal entities by commingling on an interchangeable or joint basis or confusing the otherwise separate properties, records or control."  *Id.; see also Ralls Corp.*, 27 F. Supp. at 1329 ("[T]he plaintiff must generally establish evidence of fraud, abuse of the corporate form, commingling of assets or corporate insolvency at the time of the transaction.").

In support of the Motion, Kabara specifically argues that his exercise of unilateral control over FTR is not sufficient reason to find he disregarded the corporate form, as FTR was a single member LLC operating appropriately under Georgia law.  Furthermore, Kabara addresses the allegations that he commingled his personal funds and those of FTR, arguing that Cinq failed to produce evidence of commingling and that all expenditures to develop the artists were subject to FTR's discretion. Kabara also disputes Cinq's reliance on the initial budget because Kabara provided FTR's financial statements to Cinq, and Cinq continued funding FTR with knowledge of the transactions it now disputes.

Kabara also argues that the Note is not a legally enforceable agreement because it was not executed by Cinq.  Because the Note was not enforceable, Kabara asserts that Cinq's conversion of its debt to 51% equity was not valid, and thus Kabara owed no duties to Cinq.  Kabara argues that even if the Note were valid, Kabara's failure to consult Cinq on how to spend the loaned funds is not a reason to pierce the corporate veil as Cinq failed to define and establish the specific framework in which to conduct business.  Further, Kabara notes that Cinq cannot show damages after the equity conversion because all funding and disbursements took place beforehand. For these reasons, Kabara asserts Cinq failed to show sufficient facts to support piercing the corporate veil to hold Kabara personally liable.

Cinq responds that a material issue of fact necessarily exists when commingling corporate and personal assets is alleged, and that summary judgment should not be granted unless no evidence of commingling is presented whatsoever.  Cinq cites case law stating that disregard of the corporate form is a fact intensive inquiry that is generally left to the factfinder to decide.  Cinq contends issues of material fact exist as to whether Kabara failed to abide the corporate form.  Cinq lists several allegations it contends support the finding that Kabara failed to observe corporate formalities:

1. Kabara did not follow the terms of the Operating Agreement by failing to hold annual meetings;

2. Kabara did not identify all managers in the Operating Agreement though both Kabara and Kamal Moo acted as managers;

3. Kabara did not identify Kamal Moo as a member or amend the Operating Agreement to reflect his membership;

4. Kabara did not select a board of managers;

5. Kabara did not abide the Operating Agreement in dissolving the LLC by failing to liquidate assets as required;

6. Kabara did not file a tax return for FTR in 2018 despite there being multiple members which triggers the requirement to file a tax return;

7. Kabara paid for non-business expenses from the funds advanced by Cinq even though those expenditures were not in the budget or approved by Cinq;[3]

---

[3] As set forth in Section III.d below, the only evidence Cinq points to in support of this allegation is the Declaration of G. Tyler Wright, a certified public accountant, who discloses in his expert report that Cinq directed him to assume any expenses that do not fit within the specific line items of the budget are non-business expenses.  [Cinq Resp., Ex. E, p. 8].  From the Court's perspective, this assumption renders any conclusion as to the purpose of any such expenses pure speculation.

8.  Kabara personally paid FTR's expenses; and

9.  Kabara unilaterally terminated FTR without notifying Cinq, who was a member at
    that time.

Cinq argues evidence exists that Kabara abused the corporate form and that piercing the corporate
veil is generally an issue for the finder of fact.  Accordingly, Cinq requests the Court deny the
Motion.

The Court finds that genuine issues of material fact exist regarding Cinq's claim to
disregard the corporate form in Count IV thus precluding entry of summary judgment on this issue.
First, Kabara did not dispute that Kamal Moo was a member of FTR from June 2018. This
undisputed fact contradicts Kabara's assertions in the Motion that as a single member LLC, certain
actions taken do not show an abuse of the corporate form, such as disregarding the terms of the
Operating Agreement or unilaterally terminating FTR.  Further, some evidence exists that Kabara
failed to amend the Operating Agreement to reflect Moo's interest in FTR.  Controversy also
surrounds whether Kabara's failure to select a board of managers or to hold an annual meeting was
improper conduct, considering the evidence that operations ceased within one year and that Kabara
was actively searching for managers.  Finally, Cinq presented evidence that Kabara used personal
funds for FTR's operations and evidence of an initial, five-month budget to which the parties
agreed.  Evidence of the initial budget and deviation from that budget, if the parties agreed that no
deviations were permitted, could support a finding of fraud or commingling that could support a
veil-piercing claim. *See Nat Katz & Assocs., Ltd. v. Barber,* 255 Ga. App. 207, 209, (2002)
("Resolution of this issue generally is left to the factfinder."); *Clark v. Cauthen*, 239 Ga. App. 226,
228, 520 S.E.2d 477, 480 (1999) ("[P]iercing the corporate veil is a jury issue unless no evidence
exists that would be 'sufficient to justify disregarding the corporate form.' Therefore, the grant of

10

summary judgment . . . would be authorized only if no evidence exists" to support the required inference).  Based on the record before it, the Court simply cannot conclude that no evidence exists to support the veil-piercing claim.  Accordingly, summary judgment as to Cinq's veil-piercing claim in Count IV is denied.

      b.   Count II - 11 U.S.C. § 523(a)(4)

Kabara also seeks summary judgment on Count II because he was not acting in a fiduciary capacity under § 523(a)(4).  Section 523(a)(4) excepts from discharge any debt of an individual debtor "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." To show fraud or defalcation while acting in a fiduciary capacity, "a party must demonstrate that (1) the debtor held a position as a fiduciary; (2) the claim arose while acting in a fiduciary capacity; and (3) the conduct rose to the level of a defalcation."  *Ga. Lottery Corp. v. Owens (Matter of Owens)*, 599 B.R. 388, 393 (Bankr. N.D. Ga. 2019) (Drake, J.).  The first prong, whether a debtor held a position as a fiduciary, is a more difficult task than usually believed by plaintiffs.  It is a question of federal law, *Blashke v. Standard (In re Standard)*, 123 B.R. 444, 453 (Bankr. N.D. Ga. 1991) (citing *In re Angelle*, 610 F.2d 1335, 1341 (5th Cir. 1980)), and federal courts have consistently construed "fiduciary" narrowly for purposes of nondischargeability since at least 1844.  *See, e.g., Chapman v. Forsyth,* 43 U.S. (2 How.) 202, 208 (1844) ("The act speaks of technical trusts, and not those which the law implies from the contract."); *Guerra v. Fernandez-Rocha (In re Fernandez-Rocha)*, 451 F.3d 813, 816 (11th Cir. 2006) ("[t]he Supreme Court has consistently held that the term 'fiduciary' is not to be construed expansively" (citing *Quaif v. Johnson,* 4 F.3d 950, 953 (11th Cir.1993))); *In re Standard*, 123 B.R. at 451-53 (Bankr. N.D. Ga. 1991) (discussing history of narrow construction of "fiduciary" under § 523(a)(4)).  "It is well established that a creditor who seeks a determination that its debt is excepted from discharge

pursuant to § 523(a)(4) must prove the existence of an express or technical trust and not merely the existence and breach of a fiduciary duty." *Infinity Grp. LLC v. Lucas (In re Lucas)*, 477 B.R. 236, 242 (Bankr. M.D. Ala. 2012); *see also Quaif,* 4 F.3d at 953; *Kern v. Taylor (In re Taylor)*, 551 B.R. 506, 519 (Bankr. M.D. Ala. 2016) ("A fiduciary relationship under § 523(a)(4) requires the existence of a trust."). Not just any trust will do. "It is not enough that, by the very act of wrongdoing out of which the contested debt arose, the bankrupt has become chargeable as a trustee *ex maleficio*. He must have been a trustee before the wrong and without reference thereto." *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333 (1934). "Accordingly, 'constructive' or 'resulting' trusts, which generally serve as a remedy for some dereliction of duty in a confidential relationship, do not fall within the § 523(a)(4) exception 'because the act which created the debt *simultaneously* created the trust relationship.'" *In re Fernandez-Rocha*, 451 F.3d. at 816. Instead, an express or technical trust must exist before any breach of duty. *See Quaif*, 4 F.3d at 953. Express trusts generally are voluntary trusts created by contract, *id.*, and "must generally be in writing and must express the parties' intent to create a trust, specifically define the trust property, and name both a beneficiary and a trustee." *In re Taylor*, 551 B.R. at 519.

In arguing that he did not commit a defalcation while acting in a fiduciary capacity, Kabara asserts that all funds were distributed to FTR prior to Cinq's conversion of its debt to equity. Although Kabara disputes the Note's and the equity conversion's validity, Kabara argues that even if the conversion were valid, the funds were distributed prior to the existence of any possible fiduciary capacity. Accordingly, Kabara asserts Cinq can show no damages occurred during the existence of a fiduciary capacity based on the funds loaned, and the only alleged action after conversion, the termination of FTR, caused Cinq no harm.

Cinq responds that Kabara's argument that the Note was not a binding agreement is incorrect. First, they contend Cinq in fact signed the Note. Second, even if the Note were not signed by Cinq, the contract would be enforceable, as Georgia law defines a contract broadly. Because Kabara, the party to be charged, signed the Note and Cinq accepted, an enforceable contract between the parties existed, which Kabara breached.

Cinq also argues that disputed questions of fact exist surrounding the claim for nondischargeability under § 523(a)(4). Cinq asserts that it was aware of FTR's Operating Agreement and believed Kabara and FTR were abiding by that agreement. Cinq argues that Kabara owed a duty as manager of FTR to the other members of the LLC. As of October 2018, Cinq asserts it became a member of FTR through the equity conversion. Therefore, Cinq contends that a question of fact exists regarding whether Kabara's failure to abide the terms of the Operating Agreement breached his duties to Cinq, making summary judgment inappropriate.

Having fully considered the arguments of both parties, the Court finds that no fiduciary capacity exists to support a nondischargeability claim under § 523(a)(4) as a matter of law. First, "[t]he fiduciary obligation owed to a limited liability company by its manager does not satisfy 'the strict test for determining fiduciary status under Section 523(a)(4).'" *Lenox Pines, LLC v. Smith (In re Smith)*, Nos. 17-67324-LRC; 18-05005-LRC, 2021 WL 1234245, at *9 (Bankr. N.D. Ga. Mar. 31, 2021) (Craig, J.); *see also Tarpon Point, LLC v. Wheelus (In re Wheelus)*, Nos. 07-30114-JDW; 07-3022, 2008 WL 372470, at *3 (Bankr. M.D. Ga. Feb. 11, 2008) (finding that duties imposed on managers of LLCs by Georgia statutes are not "fiduciary obligations and cannot be the basis for a fiduciary defalcation claim."). Therefore, Kabara was not acting in a fiduciary capacity as required under § 523(a)(4) as manager of FTR with Cinq as a member based on that relationship alone.

Oddly enough, Cinq cites case law reiterating the rule that managers do not meet the strict criteria under § 523(a)(4) but provides no legal authority in rebuttal. Cinq instead asserts an issue of fact exists whether Kabara breached a duty to Cinq by failing to abide by the Operating Agreement. *See Hinton v. Blocker (In re Blocker)*, Nos. 18-69243-BEM, 19-5117-BEM, 2020 WL 247311, at *7 (Bankr. N.D. Ga. Jan. 15, 2020) (Ellis-Monro, J.) ("[I]n Georgia any fiduciary duties that a member of an LLC has may be modified or eliminated (with a few exceptions) by the operating agreement."). Cinq, however, failed to show any terms in the Operating Agreement that would establish "the type of trust-like duties necessary to meet the strict standard for fiduciary capacity under § 523(a)(4)." *Id.* Therefore, the Operating Agreement does not explicitly elevate the relationship between Kabara as manager and Cinq as a member to one with a fiduciary capacity under § 523(a)(4).

Second, no evidence has been presented of a written agreement meeting the strict criteria to establish an express trust between the parties. The Note, even if its validity were undisputed, and the Distribution Agreement do not establish any fiduciary capacity in Kabara. In both instruments, the intent to create such a relationship is not clear or explicit from the terms and nowhere is the trust property specifically defined. *See Oak Street Funding, LLC v. Brown (In re Brown)*, 399 B.R. 44, 46 (Bankr. N.D. Ind. 2008) ("The 'fiduciary capacity' required by § 523(a)(4) requires something more than a debtor-creditor relationship."); *Wagner v. Abood (In re Abood),* 172 B.R. 166, 167 (Bankr. D.R.I. 1994) (holding licensing agreement must still meet characteristics of express trust and go beyond ordinary debtor-creditor relationship). Therefore, the Note and the Distribution Agreement similarly do not satisfy the strict criteria under § 523(a)(4) for finding a fiduciary capacity existed. Because Cinq failed to present evidence that Kabara committed a defalcation while acting in a fiduciary capacity, and Cinq does not allege

14

embezzlement or larceny, the Court will grant summary judgment in favor of Kabara as to Cinq's claims under § 523(a)(4) in Count II.

      c.   Count I – 11 U.S.C. § 523(a)(2)

Kabara next argues that Cinq has not presented evidence to support its claim for exception to discharge under § 523(a)(2) in Count I such that summary judgment should be granted. Section 523(a)(2)(A) excepts from discharge debts "(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-- (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). To except a debt from discharge under this section, Cinq must prove the following elements: "the debtor made a false statement with the purpose and intention of deceiving the creditor; the creditor relied on such false statement; the creditor's reliance on the false statement was justifiably founded; and the creditor sustained damage as a result of the false statement." *Fuller v. Johannessen (In re Johannessen)*, 76 F.3d 347, 350 (11th Cir. 1996); *see also Washington v. Robinson-Vinegar (In re Robinson-Vinegar)*, 561 B.R. 562, 566 (Bankr. N.D. Ga. 2016) (Baisier, J.); *Old Republic Nat'l Title Ins. Co. v. Presley (In re Presley)*, 490 B.R. 633, 638–39 (Bankr. N.D. Ga. 2013) (Diehl, J.).

Furthermore, as decisions in this district have noted regarding false pretenses,

> This exception to dischargeability addresses deceit or artifice rooted "in a specific intent to mislead, trick, or cheat another person or entity," and the intent to deceive may be shown using circumstantial evidence in relation to the totality of a situation. Beyond affirmative misrepresentation, fraud may consist in intentional silence or concealment of a material fact.

*In re Robinson-Vinegar*, 561 B.R. at 566. "[A] failure to fulfill a promise is not sufficient." *Blosser v. Boggus (In re Boggus)*, 479 B.R. 147, 155 (Bankr. N.D. Ga. 2012) (Brizendine, J.); *see also Invest Atlanta Reg'l Ctr., LLC v. Smith (In re Smith)*, 578 B.R. 866, 876 (Bankr. N.D. Ga.

2017) (Baisier, J.).  The debtor must have entered the agreement either knowing the debtor could

not, or did not intend, to perform.  *Boggus,* 479 B.R. at 155.

Finally, the Supreme Court in *Huskey International Electronics, Inc. v. Ritz*, 578 U.S. 882,

136 S. Ct. 1581 (2016) defined "actual fraud" for the purposes of § 523(a)(2)(A).  The Court

construed the terms in the section "to contain the 'elements that the common law has defined them

to include'" and found:

> "Actual fraud" has two parts: actual and fraud. The word "actual"
> has a simple meaning in the context of common-law fraud: It
> denotes any fraud that "involv[es] moral turpitude or intentional
> wrong." "Actual" fraud stands in contrast to "implied" fraud or
> fraud "in law," which describe acts of deception that "may exist
> without the imputation of bad faith or immorality." Thus, anything
> that counts as "fraud" and is done with wrongful intent is "actual
> fraud."

136 S. Ct. at 1586 (citations omitted).  "A claim for actual fraud is broader than a claim for false

representation.  Actual fraud 'consists of any deceit, artifice, trick, or design involving direct and

active operation of the mind, used to circumvent or cheat another.'"  *Veazey v. Sutton (In re

Sutton)*, 550 B.R. 917, 922 (Bankr. N.D. Ga. 2016) (Hagenau, J.) (citing *FDS Nat'l Bank v. Alam

(In re Alam)*, 314 B.R. 834, 840 (Bankr. N.D. Ga. 2004) (Bonapfel, J.)).

Kabara asserts Cinq cannot point to any specific false statement made by Kabara prior to

the request and distribution of funds in June through August of 2018 and that the proposed budget

was FTR's best estimate of future costs, which is not a false representation.  Kabara contends he

provided financial statements to Cinq and was transparent with Cinq.  Cinq chose to continue

working with FTR and attempted negotiating a new budget even after the financial statements were

provided in September 2018.  Kabara argues that Cinq could not rely to its detriment on Kabara's

representations as they had access to FTR's finances and expenditures and had the opportunity to

question that information. That the project went over budget does not prove Kabara made any false

representation or had the intent to defraud Cinq.  Therefore, Kabara argues Cinq has not provided evidence of any false statements, any intent to defraud, any specific act or statement that was intentionally false or misleading, reliance, or damages.  Accordingly, Kabara requests the Court grant summary judgment.

Cinq responds that Kabara is not entitled to summary judgment because genuine issues of material fact exist as to whether Kabara committed acts sufficient to except its debt from discharge under § 523(a)(2)(A).  Cinq submitted Jason Peterson's Declaration, which provides evidence that Kabara submitted a budget to Cinq knowing it to be false, that Cinq relied on this false budget to fund FTR, and that Kabara admitted to understating the budget with the intent to entice Cinq into funding FTR and investing additional capital to avoid loss.  Cinq relies on this declaration to show a question of fact exists as to whether Kabara's conduct meets the criteria to establish false representation, false pretenses, or actual fraud under this subsection.

The Court agrees with Cinq and finds that genuine issues of material fact surround Cinq's claims under § 523(a)(2)(A).  The Court reiterates that its function at this stage is not to weigh the evidence, but to determine whether a genuine issue exists for trial in the light most favorable to Cinq as the nonmoving party.  *Adickes*, 398 U.S. at 157.  First, Cinq and Kabara disagree on which party initiated the relationship, casting doubt on the exact circumstances that induced the parties into entering the contract, and the parties further disagree on whether the Note which governs the parties' arrangement was properly executed.  Glaringly, the circumstances surrounding the budget and Kabara's expenses appear to be disputed.  Cinq presented Peterson's Declaration in which Peterson states that Kabara later admitted to him that Kabara knew the budget was falsely deflated and would not be sufficient to produce the agreed upon recordings, but that Kabara continued with that budget to induce Cinq into investing additional capital to protect its initial investment.  On the

other hand, Kabara argues that the proposed budget was his best estimate for the required funding to produce the recordings and, in his own Declaration, states that he had no intent to injure or mislead Cinq.  Further, how the budget governed the parties' dealings, i.e. whether the budget and the line items therein were binding without toleration for deviation or whether Kabara had flexibility to spend the funds as he claims, remains unclear.

Additionally, Kabara disputes Cinq's reliance on the proposed budget, as Kabara provided Cinq with financial statements during the course of the venture.  The exact nature of the financial statements and what information they contained is disputed.  Thus, some conflict remains as to whether Cinq was aware of the potentially improper expenses and proceeded with funding nonetheless.  Genuine issues of material fact exist as to what representations were made in negotiating the initial budget, what Kabara's intent or knowledge was regarding the sufficiency of the funds at the time of entering the contract, how the budget governed the parties' dealings, and whether Cinq justifiably relied on the initial budget in continuing funding.  Accordingly, the Court denies summary judgment as to Cinq's claims under § 523(a)(2) in Count I.

d. Count III - 11 U.S.C. § 523(a)(6)

Kabara finally argues that Cinq failed to present any evidence to support a claim for exception to discharge under § 523(a)(6), making summary judgment appropriate as to Count III. Section 523(a)(6) excepts debts from discharge "for willful and malicious injury by the debtor to another entity or to the property of another entity."  "To show 'willfulness,' a plaintiff must make 'a showing of an intentional or deliberate act, which is not done merely in reckless disregard of the rights of another.'"  *Maxfield v. Jennings (In re Jennings)*, 670 F.3d 1329, 1334 (11th Cir. 2012) (citing *Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1163 (11th Cir.1995)); *see also Wells Fargo Bank, N.A. v. Sutton (In re Sutton)*, 557 B.R. 831, 836 (Bankr. N.D. Ga. 2016) (Ellis-Monro,

J.) (citing *Kawaauhau v. Geiger*, 523 U.S. 57, 61–62, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998)) ("An injury is willful when the injury itself was 'deliberate or intentional' and not merely the result of an intentional act that resulted in injury."). This standard requires a debtor to commit "an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury." 670 F.3d at 1334. The Eleventh Circuit has defined "malicious" as "wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will." *Id.* (citing *In re Walker*, 48 F.3d at 1164). "[S]pecific intent to harm another is not necessary" to establish malice. *Id.* Both willfulness and maliciousness must be shown. *Id.*

Kabara argues that Cinq has not pointed to any specific act which was willful or malicious with the intent to injure Cinq nor any actual damages resulting from a specific act. Asserting again that the Note, and therefore the conversion to equity, was invalid, Kabara claims that as sole member of FTR, he was within his right to unilaterally terminate the company. Kabara took this action due to lack of funding. Kabara argues Cinq has not shown any damages resulting from the termination. Furthermore, Kabara argues that an intentional tort must also be shown where a malicious breach of contract claim is made under § 523(a)(6) and that Cinq failed to identify any intentional tort in the Complaint.

Cinq responds that genuine issues of material fact exist as to its claim under this section. Cinq alleges that Kabara breached the terms of the Operating Agreement and that Kabara misused or commingled funds of FTR, arguing that unlawful conversion and misuse of funds accompanying breach of contract claims may rise to willful and malicious injury under § 523(a)(6). Cinq asserts they have produced evidence that Kabara knowingly presented a falsely deflated budget to Cinq to induce its investment in FTR with the intent that Cinq would be forced to invest additional capital to protect its investment. Further, Cinq contends that evidence in the record

shows Kabara did not use the funds for legitimate purposes associated with Kabara's obligation to produce and market recordings.  Therefore, Cinq argues that summary judgment should not be granted.

The Court finds Cinq failed to produce evidence to support exception of its debt from discharge under § 523(a)(6).  As an initial matter, the Court agrees with Cinq that conversion may at times support exception of a debt from discharge under § 523(a)(6).  *Gen. Ret. Sys. of Detroit v. Farr (In re Farr)*, Nos. 14-73606-WLH, 16-5325-WLH, 2018 WL 1577934, at *5 (Bankr. N.D. Ga. 2018) (Hagenau, J.); *see also Selma Dev., LLC v. Landon (In re Landon)*, Nos. 18-11292, 19-01001, 2020 WL 1584483, at *9 (Bankr. S.D. Ga. Mar. 31, 2020) ("[U]nlawful conversion and misuse of funds have accompanied breach of contract claims that rise to willful and malicious injury under section 523(a)(6).").  "For a conversion debt to be deemed nondischargeable, the creditor must show the debtor not only intended the conversion but also the debtor knew a transfer of the property was wrongful and certain to cause financial harm to the creditor."  *Farr*, 2018 WL 1577934 at *5.  The Court nonetheless finds Cinq failed to submit sufficient evidence to establish genuine issues of material fact to require a trial of the § 523(a)(6) claim.  First, Cinq relies on the Peterson Declaration to establish Kabara acted with a specific intent or substantial certainty that his actions would harm Cinq. In his Declaration, Peterson states Kabara admitted

> that he always knew the budget initially agreed to by Cinq and FTR was not enough to produce and market the audio and video recordings as promised by Mr. Kabara. He told me that his intent was to "lock Cinq in" – by having Cinq invest the initial amount in FTR and then, when Mr. Kabara and FTR ran out of money, Cinq would invest additional funds so that Cinq would not lose its initial investment.

[Peterson Decl., p. 5.].  This statement simply establishes that Kabara had the intent to obtain further funds from Cinq.  It does not state Kabara desired the injury giving rise to the debt, that he acted with the specific intent to injure Cinq, or that Kabara knew injury was substantially certain

20

to result based on his representations. *See Bankers Healthcare Grp., LLC v. Moss (In re Moss)*, 598 B.R. 508, 519 (Bankr. N.D. Ga. 2019) (Ellis-Monro, J.). Indeed, Kabara presented evidence that he used the funds in a customary way for the music industry to produce the recordings as promised. [Kabara Decl.] He further claims that he had no intent to injure Cinq, that he personally invested his funds towards sustaining the venture, and that, at some point, he offered Cinq four recordings from each artist. [*Id.*] *See Davis v. Arellano (In re Arellano)*, 574 B.R. 251, 259 (Bankr. D.N.M. 2017) (finding defendant did not act willfully because in paying for personal expenses, defendant was trying to make company successful, working on little income, and spending corporate funds due to lack of other funds). Nothing in the record suggests Kabara intended anything other than completing production of the recordings. Therefore, Cinq failed to show Kabara acted with the requisite intent for a finding of willfulness under this section.[4]

Moreover, Cinq failed to point to a specific, malicious act to support its claim under § 523(a)(6). In addition to willfulness, Cinq must also show Kabara knowingly committed some wrongful act. *Jennings*, 670 F.3d at 1334; *Farr*, 2018 WL 1577934, at *5. To establish Kabara acted wrongfully, the only evidence Cinq points to is Wright's expert report in which FTR's and Kabara's accounts are listed and analyzed, with some expenses categorized as outside the scope of the initial budget. However, Wright's expert report states that he "was asked to assume any transaction in a category that was not included in the June 2018 Budget would not be deemed a business expense of FTR." [Cinq Resp., Ex. E, p. 8]. Wright's designation of an expense as business versus personal is based solely on the above assumption. Assumptions are not facts and cannot support a finding that the expenses categorized in the report were improper or personal.

---

[4] *See also Strategic Funding Source, Inc, v. Dodge (In re Dodge)*, 623 B.R. 663, 670 (Bankr. N.D. Ga. 2020) (Bonapfel, J.) (holding that allegations that debtor entered agreement with intent not to use proceeds for business purposes or repay debt and that debtor made false statements to induce transfer of funds were insufficient to state claim for willful and malicious injury to property).

Because no evidence of a willful and malicious injury was presented, the Court will grant summary judgment in favor of Kabara on Count III.  Accordingly, it is hereby

**ORDERED** that the Motion for Summary Judgment is **GRANTED in part** and **DENIED in part**. Summary Judgment in favor of Defendants is hereby **GRANTED** as to Counts II and III. The Motion for Summary Judgment as to Counts I and IV is **DENIED**.

The Clerk's Office is directed to serve a copy of this Order upon Cinq, Cinq's Counsel, Defendants, Defendants' counsel, and any other party in interest in the above-captioned adversary proceeding.

<u>**END OF DOCUMENT**</u>